[Civ. No. 13542. First Dist., Div. One. June 16, 1948.]

JOSEPH RIVERO, an Incompetent Person, etc., Respondent, v. BIRDIE A. THOMAS et al., Appellants.

Wayne R. Millington and John F. O'Sullivan for Appellants.

Karl Brooks for Respondent.

WARD, J.—This is an appeal from a judgment ordering that plaintiff recover judgment against defendants in the sum of $5,968.40, plus interest and cost; that defendants hold title to property on Hampshire Street in trust for plaintiff "and the plaintiff has and holds a lien against said property to secure the payment of the indebtedness existing between said plaintiff and the said defendants . . . and the plaintiff's said lien is hereby fully established and confirmed for the full amount adjudged to be due to him by reason of the aforesaid indebtedness . . ." and that the homestead declared by defendants on said property is "inferior to the lien against said property in favor of the plaintiff to secure . . . said judgment . . . and that upon the sale of said real property to satisfy said judgment or any part thereof the purchaser of said property shall acquire the same free and clear of said homestead or any claim of the defendants under or by virtue of said homestead."

Three causes of action are set forth in the "Complaint to Establish Trust and for Money Had and Received" filed by the guardian of the estate of Joseph Rivero. All allege that plaintiff, Joseph Rivero "is likely to be deceived and imposed upon by artful and designing persons"; that on November 25, 1942, plaintiff delivered a written power of attorney to defendant Birdie A. Thomas, which was recorded on the 24th of May, 1944, authorizing said defendant "to sell and dispose of any property belonging to the plaintiff and to collect and receive, for and on behalf and for the use and benefit of the plaintiff, any money, property or thing of value belonging to the plaintiff"; that at all times the defendant Charles E. Thomas knew of the execution by plaintiff and the acceptance by the defendant Birdie A. Thomas of said power of attorney, and that said defendant Birdie A. Thomas was the attorney in fact of plaintiff, and that said defendants have been and are now husband and wife.

In addition the first cause of action alleges that at all times defendants had a relation of personal confidence with plaintiff; that March 8, 1944, Birdie A. Thomas received as attorney in fact, $4,478.40, and at another time in 1944, $600, belonging to plaintiff; that none of this $5,078.40 belonged to

defendants; that (upon information and belief) on March 29, 1945, defendants wrongfully paid approximately $4,000 to one Andrew Troy, in consideration for the conveyance to said defendants of real property known as 1335 Hampshire Street, which was duly recorded, and that on April 26, 1945, defendants declared and recorded a homestead on said property. The existence of a trust in said real property is alleged, as is defendants' wrongful detention of said property in violation of said trust. Exemplary and punitive damages of $2,000 are claimed in addition to actual damages.

The second cause of action sets forth that defendants have concealed the location of said $5,078.40; that demand has been made by plaintiff to deliver said monies or the converted res thereof, but that defendants have not made such delivery or accounted for said monies or property; that (upon information and belief) defendants have appropriated $5,078.40 for their own uses and have mingled said sum with their own funds, and that upon the wrongful retention of $5,078.40 by defendants, or the converted res wrongfully acquired with said monies, ''a trust was created for the benefit of plaintiff, Joseph Rivero, as beneficiary, and thereupon the said defendants, Birdie Thomas and Charles E. Thomas, and each of them became . . . trustees of said monies, or converted res, for the benefit of the said plaintiff.''

Defendants' indebtedness to plaintiff in the amount of $5,078.40 for money received by them for the use of plaintiff, which they promised to pay on request, but although requested have not paid, is set forth in the third cause of action.

The answer admits the appointment of Guy Rivero as plaintiff's guardian and the execution by plaintiff of a power of attorney to, and accepted by, defendant Birdie A. Thomas. Simplifying the problem of determining the facts of the case is the admission of the allegations of paragraph V—that Birdie A. Thomas received as plaintiff's attorney in fact $4,478.40 and $600, totaling $5,078.40—and of paragraph VI—that none of said monies belonged to defendants. As to the allegations that plaintiff reposed the greatest personal trust in defendants and that defendants had a relation of personal confidence with plaintiff, these allegations are admitted as to Birdie Thomas but denied with respect to Charles Thomas. It is alleged that all monies received by Birdie Thomas on account of plaintiff ''have been, prior to the declaration to the incompetency upon the said Joseph Rivero paid

to him and that these defendants nor either of them have any money or things of value belonging to the said Joseph Rivero.'' The other allegations of the first two causes of action are denied. As to the cause of action sounding in debt, defendants admit that they have paid no sum to plaintiff ''and in that respect aver that they are not indebted to nor are they holding any money or things of value belonging to'' plaintiff.

Defendants present the questions involved: ''1. Whether or not there is sufficient evidence to justify the findings of the Court and its judgment whereby the Court found that the defendants herein had misappropriated the aforesaid sums realized from the real property in Alameda County and San Mateo County and had misappropriated the rents collected from the Alameda County property. 2. Whether or not the plaintiff in the case has assumed the burden of and has traced the alleged money into the property upon which the lien has been imposed. 3. Whether or not the amount imposed as a lien upon said property has been disclosed to have been placed in said property from the alleged proceeds of the said sales of the Alameda County and San Mateo County properties and the rents collected from the Alameda County property.''

Plaintiff reframes the first question in the following form: ''Whether or not the defendants proved by a preponderance of the evidence that the defendant, Birdie A. Thomas, as a fiduciary of the incompetent plaintiff had accounted for the aforesaid sums of the plaintiff in the total amount of $5,468.40 which she admittedly received.''

Plaintiff, the incompetent, testified that he is 65 years old and the brother of Guy Rivero, the guardian of his estate. He stated that he lived at 1335 Hampshire Street in San Francisco until ''two or three years ago'' when he moved to Santa Rosa, and that while he lived in San Francisco he worked as a hod carrier and as a stevedore on the waterfront. He testified that he could write his own name and the address of his former home in San Francisco but nothing else, and that he could not read, although he was able to read off ''A-l-a-m-e-d-a'' and ''13712'' from a check constituting plaintiff's Exhibit 1, it appears that he did not know their meaning and he could not determine the amount of said check, nor did he know the value of a thousand dollar bill. At the court's suggestion it was brought out that, unlike defendants, plain-

tiff's parents were both Mexican. He testified that his wife, of whom Birdie A. Thomas was the daughter by a prior marriage, handled the household affairs and financial matters up until her death in November of 1942. At her death he owned two unimproved lots in South San Francisco and a house in Alameda which they rented. After his wife's death, Birdie Thomas handled the affairs of the house at 1335 Hampshire Street—he paid $10 a week board—until he went to Santa Rosa. When plaintiff testified in rebuttal it was brought out that when he put in his application in Santa Rosa for the old age pension he first learned that the property in Alameda had been sold. It was stipulated that plaintiff's Exhibit 1, a check drawn by the Alameda County-East Bay Title Insurance Company, No. 13712, dated Oakland, California, March 8, 1944, in the sum of $4,478.40, made payable to the order of Joseph M. Rivero, was received at the home of Mrs. Birdie Thomas in payment of the purchase price of the Alameda property owned by Mr. Joseph M. Rivero. It was also stipulated that plaintiff did not sign his name on the back of the check, but that it was done by Mrs. Thomas. Plaintiff could not recollect getting more than $150 from the sale of the Alameda and South San Francisco properties. He testified that Mrs. Thomas did not make an accounting of the money she received and did not pay him any of the rentals received from the Alameda property.

On cross-examination it was brought out that in March, 1944, he opened a safe deposit box at the Bank of America on Powell Street. He testified he did so ''To have it convenient so that I could put my checks in there when I worked as a stevedore. She told me that I could put them in there and I wouldn't have to be bothered with the bank.'' Although he couldn't remember when he quit working as a stevedore he testified that he was working when he rented the safe deposit box. Subsequently he testified that he worked up to at least March 11, 1944, and by stipulation his withholding receipt issued by the Waterfront Employers Association, showing total wages paid in 1944 in the amount of $422, and the income tax withheld, $40.40, was admitted in evidence. He stated that when he opened the box he put in his wallet— around $75, $80; he closed the box when he went to Santa Rosa to live with his mother. In rebuttal he subsequently testified that when he closed the box there was about $180 in it, and that he never opened the box between the time it

was rented and when it was closed. Defendants' counsel asked if he remembered meeting Mrs. Houlohan when he came out of the bank after renting the box. He said, "Yes" and that she said, "Hello, Joe." He denied telling her what he had done. He denied telling Mrs. Sheerin not to speak to his relatives about having money. He testified that he had a savings account at Twenty-fourth and Bryant Streets of $300 which he closed when he went to Santa Rosa. On redirect examination it was brought out that the safe deposit box was rented at Birdie's suggestion. She was with him when the box was rented.

On recross-examination an attempt was made to show that plaintiff wanted to keep from his relatives knowledge that he had any money. He denied stating that he did not want his daughter—by his former marriage—Josie, to know of his money because she wanted to borrow money to buy a place in the Fillmore district. He again denied telling Mrs. Houlohan, Mrs. Thomas, Mrs. Sheerin and Mrs. Johnson not to talk about his having gotten money from the sale of his house.

The depositions of the defendants were introduced by plaintiff. Mrs. Thomas testified that on the day her mother died she secured a power of attorney from plaintiff. At her death, her mother owed her about $2,000 constituting a loan of Mr. Thomas' earnings to enable her mother to meet expenses of an accident to plaintiff. Neither she nor Mr. Thomas owned any real property at Mrs. Rivero's death. She arranged for the sale of plaintiff's property in South San Francisco for which she received $600, and his property in Alameda for which a check for $4,478.40 was received. She stated that the purpose of the power of attorney was not for the selling of property and stated that she did not exhibit it either in the administration proceedings for her mother or at any time other than in connection with the sale of the properties. On March 29, 1945, she purchased the property at 1335 Hampshire Street from Troy for $4,000, and on April 26, 1945, a declaration of homestead was placed on the property by defendants; the declaration was prepared by "the real estate man." She described the improvements made on said property—plastering, new brick steps, archways installed, hardwood floors. As to the rentals from the Alameda property—prior to its sale—the book showing the rents received was burned; $60 was collected in a lawsuit against the Alameda tenant.

Lending support to some of Mrs. Thomas' testimony given while testifying in her own behalf, are the following exhibits: the signature card for the safe deposit box at the Bank of America, 1 Powell Street, showing that Joseph M. Rivero opened the box March 11, 1944; the tag showing that the box was closed December 7, 1944; the record of the account of Bertha Dehne, an aunt of Mrs. Thomas, with the San Francisco Bank, opened March 17, 1936, showing that on September 8, 1944, a power of attorney was executed giving Birdie A. Thomas the right to withdraw therefrom, and that the account was closed January 2, 1945. It also showed that on September 13, 1944, the account was credited with the proceeds of 100 shares of Pacific Gas & Electric Company stock which stood in the name of Bertha Dehne, in the amount of $3,689.14.

When testifying in her own behalf Mrs. Thomas stated that the check for $4,478.40 came through the mail. At dinner, in the presence of plaintiff, her husband, and her sister-in-law Mrs. Johnson, she handed the envelope to plaintiff who opened it, "read it," and handed it to Mrs. Johnson. In her deposition she stated that plaintiff asked Mrs. Johnson to read the contents to him, which she did. Plaintiff asked her to cash the check. The next day she cashed it in the presence of Mrs. Johnson who carried the money—including four $1,000 bills—in her purse. In her deposition she stated that she did not remember who had written the "Joseph M. Rivero" on the back of the check, or at which bank the check was cashed. At the trial she testified that she wrote "Joseph M. Rivero" under which she wrote her name and address, and that she cashed the check at the Bank of America; the court noted the fact that the "Joseph M. Rivero" might be a different "or a disguised handwriting" from Mrs. Thomas' name and address. About four months after the matter was submitted the court reopened the case for more testimony on the circumstances surrounding the cashing of the check and at that time Mrs. Thomas stated that after showing the check to the teller she went to the manager of the bank who o. k.'d it; the Bank of America had no record of the "O. K."

In conflict with plaintiff's testimony that he received only $150 from the sale of his property is Mrs. Thomas' testimony that around dinner time of the day when the check was cashed —Friday night—in the presence of Mrs. Johnson and her husband, she gave plaintiff the cash—"four $1,000 curren-

cies and then the rest in small denominations.'' He wanted her to go with him and open a safe deposit box because ''he didn't want his people to know it when he applied for the old age pension, they wouldn't know how much he had.'' He took the money into his bedroom. In her deposition she stated that immediately after she handed him the money ''He took it in his room and put it in a book. . . . He had a habit of doing things like that.''

She testified that the next day she met plaintiff by appointment and he opened a safe deposit box at the Bank of America and she saw him sign the signature card. He put in $4,478.40. When they left the bank they met Mrs. Houlohan: Mrs. Thomas testified that plaintiff said, ''I have just put all my money in the safe deposit box'' and Mrs. Houlohan replied, ''That is fine, Joe.''

As to the $600 proceeds from the South San Francisco property, in her deposition Mrs. Thomas stated that it was paid to her in currency, and that she paid it all at one time to plaintiff. She testified that when she gave the money to plaintiff ''He said he was going to deposit it in the bank on 24th Street . . . and he then went and bought himself an $82 suit, tailor-made suit . . . $15 pair of shoes and a $12.50 hat'' and that the money ''all went.''

In order to answer plaintiff's contention that the proceeds of the sale of his property went into the purchase by defendants of the property at 1335 Hampshire Street, defendants introduced evidence of the receipt of considerable amounts of money from Mrs. Thomas' aunt, Mrs. Bertha Dehne. Under the power of attorney giving Mrs. Thomas power to withdraw from Mrs. Dehne's account, $3,500 was withdrawn between September 13, and November 14, 1944. On September 8 (13th) 1944, 100 shares of Pacific Gas & Electric Company stock were sold and $3,689 deposited to Mrs. Dehne's account. Mrs. Dehne was a patient at the Franklin Hospital, San Francisco, for about four months prior to her death on December 31, 1944. Mrs. Thomas paid her expenses, but she produced no records regarding the amounts paid. She did, however, produce the hospital bill amounting to $817.85 and the funeral bill for $471.20. There is therefore no dispute that of the $3,500 withdrawn, at least $1,289.05 was paid out, leaving only $2,210.95. Mrs. Thomas also testified that her aunt gave her for the aunt's expenses two $1,000 currencies which she had in her handbag at the hospital—''I had them at home, and

I paid just what the amount was at the hospital." When questioned concerning her aunt's expenses at the hospital, all of which were paid by Mrs. Thomas, she stated that $112 was paid to the nurse and that she gave "her as high as $10 a day for tips to the nurses; that went on and on and on." The following is illustrative of Mrs. Thomas' testimony throughout the trial: "[Cross Examination]

"Q. You were the administratrix of her estate, too, were you not? A. Yes.

"Q. And in the inventory that you filed in that estate, you made no mention of that $2,000, did you? A. Well, I had paid out my own money.

"Q. I know, but you made no report of the fact that you held those two thousand dollars at that time, did you? A. No, because I had been spending my money.

"Q. You filed no account—I mean, you filed no claim against her estate for that $2,000, did you, or any monies that you paid out—you didn't file any claim against that estate, did you? A. Well, I paid it out of my own money. . . .

"Q. How much money did you pay out of your own money during that time? A. I just don't know. My aunt was a liberal woman. I would give her as high as $10 a day for tips to nurses; that went on and on and on.

"Q. And where did you get the money to pay these bills? A. I would give it to her from my money.

"Q. And where did you get your money? A. My husband's salary.

"Q. And how much—did you say you paid out, all of the bills out or money that he earned from the time she was in the hospital? A. Yes.

"Q. How much money did your husband earn from the time that Mrs. Dehne went to the hospital until her death? A. About $75 a week.

"Q. About $75 a week. For the period from the time Mrs. Dehne went to the hospital until her death, is that correct? A. Yes.

"Q. And during that time you had your living expenses, did you? A. Yes.

"Q. And how much living expenses during that time? A. Very little.

"Q. About how much? A. Maybe $6.

"Q. $6 a week? A. Yes.

"Q. Were you paying rent for the house? A. Yes.

"Q. How much was the rent? A. $18 a month. . . .

"Q. And what were your grocery bills a month? A. My husband brought all that home.

"Q. He brought it home. He must have bought it—he didn't steal it? A. No, sir.

"Q. How much did he pay for his groceries? A. I don't know. . . .

"Q. How much did you spend a month for bills? A. Well, there was the gas and the lights and telephone.

"Q. And how much did that amount to? A. Oh, the telephone was about $3.25 a month and the gas and light, that was about four-something. . . .

"Q. . . . Did you have an automobile? A. Yes.

"Q. How much did you spend operating that automobile? A. That I don't know."

From the foregoing it appears that the court could reasonably reach the conclusion that whatever money Mrs. Thomas received from her aunt was used to cover the aunt's expenses.

The deposition of Charles E. Thomas supports the statements of his wife. He stated that at Mrs. Rivero's death, he owned no real property and that he earns—and earned November 25, 1942—$75 a week. At her death Mrs. Rivero owed defendants $2,000 which had been borrowed to cover plaintiff's expenses. He stated that he was present when the check was delivered; that he did not know who wrote on the back thereof, and that both he and his wife told plaintiff it would be good for him to have a safe deposit box. With respect to the purchase of the home on Hampshire Street he stated that he used funds received from his wife; that he didn't know why the homestead was put thereon and that his friends made improvements to the property. There was also evidence that Mrs. Thomas had received $390 in rentals on the Alameda property.

At the conclusion of plaintiff's case in chief, motion for nonsuit was made. In denying the motion the court pointed out that plaintiff testified that he had received $150 from the sale of the property.

Defendants' case consisted primarily in Mrs. Thomas' testimony, set forth above, supplemented by the testimony of other witnesses, part of which was corroborative and part inconsistent with the testimony of Mrs. Thomas.

The court found that Joseph Rivero, by reason of old age and weakness of mind was unable to manage his property

and was likely to be deceived by designing persons; that on or about November, 1942, and thereafter, plaintiff reposed trust in defendants and that a relation of personal confidence existed between them; that Mrs. Thomas received $5,468.40 including rental income, which she held in trust for plaintiff, which was known by Charles E. Thomas. It was further found ''That on or about the 29th day of March, 1945, the defendants, without the authorization or consent of plaintiff, wrongfully paid and delivered the sum of Four Thousand and no/100 Dollars from said monies of the plaintiff to one Andrew Troy in consideration for the wrongful transfer and conveyance to said defendants, Birdie A. Thomas and Charles E. Thomas, of that certain real property known as 1335 Hampshire Street in the City and County of San Francisco, California. . . . That the title and ownership of said property transferred and conveyed by said Andrew Troy, and all thereof, is held by the defendants as trustees of and in trust for the plaintiff, and as security for and to secure the payment to the plaintiff of said total sum of Five Thousand Four Hundred Sixty-Eight and 40/100 ($5,468.40) Dollars received by the defendants and said interest thereon.''

A reviewing court has no authority to reverse a case merely because the evidence as read in cold type on appeal ''preponderates'' in favor of the losing litigant. *Cox* v. *Cox,* 82 Cal.App.2d 867 [187 P.2d 23]. The power of this court ends when substantial evidence appears in the record to support the judgment. *Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427 [45 P.2d 183].

Defendants contend that the burden is not upon Mrs. Thomas to show that she actually delivered the money to plaintiff. The trustee has the burden of establishing the correctness of trust accounts, but is not required to anticipate charges of dereliction of duty. *Neel* v. *Barnard,* 24 Cal.2d 406 [150 P.2d 177]; *Purdy* v. *Johnson,* 174 Cal. 521 [163 P. 893]. In the present case the evidence established payments which reached the control of Mrs. Thomas with the knowledge of her husband, which under the circumstances surrounding the facts of the present case required an accounting by defendants of the property and monies with which they were primarily chargeable. *San Pedro Lumber Co.* v. *Reynolds,* 121 Cal. 74, 89 [53 P. 410].

At this point it may be well to consider whether the inclusion of Charles E. Thomas in the judgment is proper.

The evidence shows that the husband did not receive the money directly but he received it from his wife and in turn purchased the Hampshire Street property. Mrs. Thomas claimed that she received some funds from her aunt, but this amount would be insufficient to cover the $4,000. A reasonable inference may be drawn that the only money she could have given her husband was the money received from plaintiff's property. Mr. Thomas admitted that the money came from Mrs. Thomas. It is reasonable to infer that he knew it did not come from the aunt. Defendants do not contend that the particular finding that Mr. Thomas knew that Mrs. Thomas had received $5,468.40 as agent in fact and trustee of plaintiff is erroneous. At the time of Mrs. Dehne's death it was the duty of Mrs. Thomas to account to Mrs. Dehne's estate for any money belonging to Mrs. Dehne held by Mrs. Thomas. It is true Mr. Thomas testified that Mrs. Thomas told him the money used in the purchase of the property had been received from Mrs. Dehne. Mrs. Dehne's estate would not be distributable for six months after her death. Considering the date of her death, to hold that Mrs. Thomas used Mrs. Dehne's money would require Mr. Thomas to infer that Mrs. Thomas embezzled part of Mrs. Dehne's estate.

Five thousand, nine hundred sixty-eight dollars and forty cents is the total amount of the judgment. Five hundred dollars represents an exemplary and punitive award. The balance —$4,478.40, $600 and $390—has been previously mentioned. The trial court imposed a lien on the Hampshire Street property for the full amount of the judgment.

Defendants contend that part of the money obtained from the disposition of plaintiff's property was not traced to the investment in the Hampshire Street property and that therefore the imposition of the lien is improper. The law deems that one who has wrongfully acquired the legal title to property holds the property as trustee. Such a trust is sometimes referred to as an involuntary trust. (Civ. Code, §§ 2223, 2224.) Courts often use the term "constructive trust" as indicative of cases where there is no intention to create a trust. (25 Cal.Jur., § 19, p. 146.)

In the present case there is evidence indicating that all of the funds Mrs. Thomas was delegated to collect, and arising from the property she was authorized to handle, were invested in the purchase or improvement to the Hampshire Street property, or that the money was commingled with

the Thomas' personal funds. Mrs. Thomas claimed the purchase money for the Hampshire Street property was obtained from her aunt, but the trial court has made it plain that this evidence was not believed. ■ Except in cases involving the rights of creditors, or where the parties have agreed to mingle funds, when money may be traced to a particular fund, or when it is commingled with other funds, the beneficiary may enforce the trust. In *Noble* v. *Noble,* 198 Cal. 129 [243 P. 439, 43 A.L.R. 1235] and in *Mitchell* v. *Dunn,* 211 Cal. 129 [294 P. 386], it was held that it was not necessary to trace definitely the property. The degree of identification of trust funds depends upon the circumstances surrounding each case. If the evidence preponderates in a demonstration of the unfaithfulness of the trustee, there the strict rule of identification may be relaxed. In *Garrison* v. *Edward Brown & Sons,* 25 Cal.2d 473, at page 480 [154 P.2d 377], it was held that an ascertainable interest in a bank account of the trustee in which funds of the trustee and of the beneficiary are deposited constitutes an asset definite enough to be the subject matter of a trust.

■ In the present case the reply brief contains the following: "He [plaintiff] : shows that she [Mrs. Thomas] collected the rents and the proceeds of the two sales." Defendants claim that no evidence was offered as to the disposition of the money. No equitable rule approves of a trustee's admission of the receipt of money and a denial of liability because the trustor does not know where each penny was placed.

■ In the present case the trial court did not determine that defendants held title to the property on Hampshire Street in trust for plaintiff. Instead a lien was imposed upon the property. The matter of determining the appropriate equitable relief to be granted to a beneficiary is generally left to the good judgment of the trial court. If the method is in accordance with an applicable law, the trial court's judgment should prevail. "From the very nature of equity, a wide play is left to the conscience of the chancellor in formulating his decrees, that justice may be effectually carried out." (10 Cal.Jur. § 5, p. 462.) That the imposition of a lien may be a fair course to pursue in certain cases has been approved in *Mitchell* v. *Dunn, supra.*

■ It was ordered on December 21, 1946 that plaintiff recover judgment in the sum of $5,968.40. Interest on $4,868.40 was fixed at 7 per cent from March 9, 1944, and

interest on $600 from May 1, 1944, at 7 per cent; plaintiff's costs and disbursements were also awarded. It was ordered that a lien was established and confirmed for the full amount adjudged. Plaintiff is entitled to judgment for the respective amounts of $4,868.40 and $600 as the amount of the trust. The interest and costs of suit are mere incidents to be protected by the established lien on the amount of the trust, but that does not cover the full amount of the lien as adjudged.

 The extra $500 was awarded as punitive or exemplary damages. "As a general rule, courts of equity will not award exemplary damages, although this rule is not without exception." (15 Am.Jur. p. 704.) "Exemplary or punitive damages are not recoverable as matter of right. Their allowance rests entirely in the discretion of the jury, and they may be awarded only where there is some evidence of fraud, malice, express or implied, or oppression." *Clark* v. *McClurg*, 215 Cal. 279, 282 [9 P.2d 505, 506, 81 A.L.R. 908]. In the present case evidence of fraud appears. This court is not in a position to say that the award or assessment of exemplary damages, under all of the circumstances of this case, is unjust and unreasonable. A lien is imposed upon property to insure the performance of a designated act (Code Civ. Proc., § 1130), such as the payment of trust funds. Exemplary damages are not awarded to secure the performance of the payment of trust funds, but as an example to others to refrain from fraud in the performance of a trust. Its imposition is distinct and separate from the basis of the action, namely the enforcement of a trust. Punitive damages may not be secured by a lien without special statutory provision. None has been called to the attention of this court.

The judgment is affirmed with the lien securing the items enumerated therein except the $500 exemplary damage judgment. In the latter respect the judgment and conclusions are modified by striking therefrom all references to the lien securing the judgment of $500 for punitive damages. The means of collection of the $500 is left to the ordinary channels of the collection of a judgment awarding damages. The plaintiff is to recover his costs.

Peters, P. J., and Bray, J., concurred.