WEIDNER, Respondent v. LINEBACK, et al., Appellants

(140 N.W.2d 597)

(File No. 10216. Opinion filed February 24, 1966)

Rehearing denied June 15, 1966

G. F. Johnson, Gregory, for defendants and appellants.

John Simpson, Winner, for plaintiff and respondent.

HANSON, Judge.

Robert Weidner commenced this action for personal injuries against defendants, Don Lineback and Joe Lineback, doing business as the Lineback Supply and Transportation Company of Winner, South Dakota. The jury returned a verdict in favor of plaintiff in the amount of $35,113 and defendants appeal from the judgment and order denying a new trial.

The accident occurred on December 2, 1961 as Weidner was driving defendants' tractor and semitrailer on U. S. Highway 12 down the east slope of the Continental Divide near Helena, Montana. Being unable to control the speed of the rig he failed to negotiate a curve in the highway near the base of the mountain. As a consequence, plaintiff sustained the injuries complained of. He alleged the cause of the accident was defendants' failure and neglect to equip the tractor and trailer with proper brakes and to inspect and maintain the same in a reasonably safe condition.

Defendant, Joe Lineback, was made a party on the theory he was in partnership with his son, Donald Lineback. This issue was submitted to the jury and we find, without detailing all the evidence relating thereto, that there is ample substantial and credible evidence from which the jury could find defendants were associated together as a business partnership beyond the informal relationship of father and son.

As defendants had not complied with the South Dakota Workmen's Compensation Act the defenses of contributory negli-

gence and assumption of risk are not involved. SDC 64.0109. They claim the accident was caused solely by plaintiff's failure to properly gear the truck down and the trial court erred in denying their motion for a directed verdict upon the ground that plaintiff failed to sustain the burden of proving actionable negligence. In determining whether the evidence of defendants' negligence was sufficient to warrant submission to the jury plaintiff is entitled to have the evidence viewed in a light most favorable to him. The test is "whether there is any substantial credible evidence viewed in the light most favorable to the plaintiff which tends to sustain the verdict." Parham v. Dell Rapids Township, 80 S.D. 281, 122 N.W.2d 548.

Plaintiff was employed by Linebacks as a truck driver in November 1961. He had four years' experience driving semi-trucks. On the trip resulting in the accident plaintiff left Winner, South Dakota, with a load of feed which was delivered to farmers and ranchers in the central part of the state. At Huron he picked up a load of corn weighing 72,000 pounds and started for Missoula, Montana. At Pierre he had trouble stopping the truck coming down a hill on Highway 14 in the city. When plaintiff reached Billings, Montana he called Donald Lineback and informed him he had a tachometer cable and a speedometer cable installed. He also told him about having trouble with the brakes in Pierre and thought the brakes needed relining and the drums turned. Lineback didn't think such work was necessary as the brakes had been relined shortly before plaintiff was employed. He suggested the brakes be set up. This was done. On all trips plaintiff carried signed blank checks of his employers which could be used for necessary repairs, but it was customary to call Lineback before any major repair was made.

Plaintiff proceeded to Missoula where the load of corn was sold and a 72,000 pound load of plywood picked up. He then started back to South Dakota over the same route. This road crossed the Continental Divide. When he arrived at the crest he stopped and checked his load, tires, and air supply. Two weeks before plaintiff rode down the same mountain road with an experienced driver employed by Colonial Pacific who frequently drove the same road. This driver experimented with

the gears of the Lineback truck to determine what gear would best control the rig and maintain an adequate air supply. He started out in first gear and shifted up to fourth. The tractor had 10 gears.

This was a continuous five or six mile winding mountain road down grade with many curves. Plaintiff started down in first gear and shifted up to fourth. His testimony describing the remainder of the trip is as follows:

"Q. From the time you started on top of the mountain coming down could you tell just what happened?

"A. Well, I started down the mountain, part of this wasn't too steep, the further you go the steeper it gets. Your gears or motor will hold your truck back considerably although I gained speed at all times. You have to keep your motor wound up so you keep your air supply built up. I drove in fourth, which seemed to handle the load or hold the load back without a lot of strain on the motor and yet keep it pretty much under control. If you had any brakes at all, you could control it real good. After going down there some ways the RPM built up and I was in fourth gear and I set the brakes and slowed the rig down.

"Q. Did the brakes work?

"A. Yes, sir, I set the brakes and slowed it down and then just let it proceed down the hill in fourth gear. I recall the needle coming up and then some distance further down at the next curve if I remember right, why I stepped on the brakes again and the RPM came back up and I had no brakes, they went clear to the floor. I looked to see what happened and had about 30 pounds of air. My RPMs built to the top and I had no brakes. I reached along side the driver's seat and shut the trailer brakes off and they should lock.

"Q. What do you mean?

"A. It is a supply tank and if you lose your air or go below 30 pounds—

"Q. What does it do?

"A. It sets the trailer brakes.

"Q. This is an auxiliary tank that is supposed to have this pressure set - up?

"A. Yes, and hoping to build up enough air on the tractor to control the load and come down the hill or get it stopped whichever the case may be and things happened pretty fast and about that time the RPM was up to the peg, way over and high as it can get. I shifted one gear up still hoping to build up air. Outside of not having brakes, I wasn't in any trouble. If I could get air built up I could still control my load. The trailer brakes never did set enough to know they did and I could never get enough air built up and the tractor brakes couldn't handle the load. I got the air built up to where the brakes would get hot but wouldn't stop it.

"Q. That is on the tractor?

"A. Yes, my RPM would build up and I would shift one more and finally I ran out of gears.

"Q. About how fast do you think you were going when you ran out of gears?

"A. I would say in the neighborhood of 100 miles an hour, too fast. Prior to this there was a car coming up the hill. I blinked my lights and thought they might see I am in trouble. I met this car and them being on the inside and me on the outside there was

> nothing I could do but take it on the outside or run
> over somebody and I took it on the outside and that
> is the last I remember."

The tractor and trailer went off the highway and plaintiff was severely injured. When he first recovered consciousness he said he lost his brakes and his brakes did not hold.

On previous trips plaintiff had informed defendants about having trouble with the brakes, but they were never repaired or examined by an expert to determine if repairs were necessary. There was also testimony the brakes on the tractor - trailer were not capable of stopping the vehicle within the limits prescribed by statute.

Defendants contend the opinion and circumstantial evidence relating to defective brakes cannot preponderate over direct and circumstantial evidence showing the brakes were in a reasonably safe and satisfactory condition. In this respect it was shown that the brakes on the trailer had been relined and put in first-class condition on February 16, 1961. The brake drum and shoes from the trailer were produced in court and the mechanic who dismantled them found no defective parts. Brake experts testified there were 50,000 miles left on the linings and hubs and only 1/16th of an inch of the original 3/4 inch of brake lining had been used. It was further shown that a hubometer had been installed when the brakes were overhauled in February 1961. At the time of the accident the hubometer reading was 28,247 miles. The expert under whose supervision the trailer brakes had been overhauled stated drums and linings would not ordinarily need repair for 40,000 miles under the hardest conditions such as mountain driving and 200,000 miles under the best conditions. However, the carbonization on the various brake drums was not even indicating the heating of the brakes may have been caused by brake drag or mechanical malfunction rather than by over use. The brake expert called by defendants was also unable to express an opinion as to what caused the brakes to fail by an examination of the drums and linings after the accident. Such physical evidence as to the condition of the brake drums and

16

shoes after the accident is not so conclusive this court can say, as a matter of law, the brakes were adequate at the time of the accident. Breen v. Keen, 55 S.D. 150, 225 N.W. 223.

■ Nor can this court weigh the probabilities arising from the evidentiary facts to determine whether it is more probable the accident was proximately caused by plaintiff's failure to gear the truck down or by inadequate brakes. In Parham v. Dell Rapids Township, 80 S.D. 281, 122 N.W.2d 548, the criminal law rule of proof by circumstantial evidence was held to have no application in civil actions. It is enough, the court said, "that a plaintiff in a civil action prove mere preponderance of probability". As the United States Supreme Court pointed out in Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520, "It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable * * * That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."

■ The evidence justified an instruction to the jury on defendants' duty to exercise reasonable care in furnishing plaintiff with a safe truck and to make inspections or tests necessary to maintain the same in a reasonably safe condition. The court was not obligated to specify with particularity the nature, type, or frequency of such tests or inspections as "It was for the jury to determine whether a defective condition existed, whether a

reasonable inspection would have revealed the defect, and what constituted a reasonably adequate inspection in all the circumstances." Devens v. Goldberg, 33 Cal.2d 173, 199 P.2d 943.

██ ██ Likewise, an instruction was properly given the jury on the distances brakes on motor vehicles should be able to stop vehicles at various speeds. Under this law the brakes on a vehicle are not deemed adequate unless capable of stopping in a distance of 102 feet at a speed of 40 miles per hour. Plaintiff testified in this regard:

"Q. Any time you drove this truck and trailer were you ever able to set the brakes hard enough so the wheels would lock?

"A. Not with a load.

"Q. They would empty but not with a load?

"A. That's right.

"Q. Now in your opinion, Robert, in relation to a city block, when this truck is fully loaded on a dry surface and level, how far would it take you to stop that truck in the condition the brakes were in on that particular day if you were going 40 miles an hour?

"A. I would say to a complete stop, it would take a block and a half, maybe two blocks.

"Q. Fully loaded?

"A. Yes."

Defendant, Donald Lineback, also testified as to stopping distances as follows:

"Q. You would be acquainted with how quickly you would be able to stop this vehicle fully loaded with 72,000 pounds gross weight?

"A. Yes.

"Q. Driving 40 miles an hour, would you be able to stop it in a block?

\* \* \*

"A. At 40 miles an hour on a level surface you could stop it within one half or three quarter block.

"Q. · But not less than half a block?

"A. I doubt less than half a block."

Later on Lineback qualified his estimated stopping distances by testifying he had never had an emergency; had never tried to stop the truck at 40 miles per hour; and had taken reaction time into consideration. The stopping distances set forth in SDC 44.0346 are designed to test mechanical brake efficiency. No allowance is provided for the human factor of "reaction" or "mind to brake" time. Whether or not plaintiff took "reaction" time into consideration was a proper matter to be probed on cross-examination to test the accuracy of his answers. Lack of definiteness in this regard in view of all the evidence on the subject did not destroy the propriety of the instruction of our brake law. It was for the jury to determine the credibility, weight, and convincing force of evidence relating to that issue.

At the time of the accident plaintiff was 36 years of age. He suffered bruises, a compression fracture of vertebrae, fractured ribs on both sides of his body, and a fractured left scapula or shoulder blade. He experienced considerable pain, and the function of his left arm and shoulder was permanently diminished twenty-five per cent. This limitation of motion, loss of strength, pain, and fatigue will affect the kind and character of work he will be able to perform in the future. He has a life expectancy of 32 years and no formal or technical training beyond grade school. Defendants paid all of the hospital and medical bills except $113.00. They also offered plaintiff work of a lighter nature upon his return. He did not return. Instead, on December 7,

1962 he went to work as a policeman for the City of Winner. As such, he was making more money at the time of trial than he made as a truck driver before the accident. Because of this defendants contend it was error to allow the jury to consider loss of earning capacity as an element of damages.

 The same contention was made in the early landmark case of Davis v. Holy Terror Mining Co., 20 S.D. 399, 107 N.W. 374, and answered by the court as follows: "It does not follow that the loss of a limb is not a detriment because the miner who suffers the loss might make more money in some other vocation than he was making before the injury was received." Similarly in United States v. Jacobs, 5 Cir., 308 F.2d 906, this contention was held to be without merit because "the purpose of the award of damages is to compensate for the loss of earning capacity as distinguished from actual loss of earnings." See also Wilson v. Sorge, 256 Minn. 125, 97 N.W.2d 477 and Morris v. Cartwright, 57 N.M. 328, 258 P.2d 719. The general nature of loss of earning capacity was recently discussed in Allen v. Martley, 77 S.D. 133, 87 N.W.2d 355, and no useful purpose would be served by restating those principles here. It is enough to point out that loss of earning capacity is an element of general damages which need not be specially pleaded and permits an injured party to recover for loss of earning power in the future based on such factors as the nature and extent of the injury, age, life expectancy, talents, skill, experience, training, education, and industry. Spalding v. Loyland, N.D., 132 N.W.2d 914. The mere fact plaintiff is earning more money now than he earned before the accident does not defeat his right to recover for impaired earning power reasonably certain to be suffered during the remainder of his life expectancy. It is a matter of common knowledge his earning power would be greater if he were full bodied and uninjured.

 Defendants further seek a new trial on the ground the verdict is excessive. The verdict is generous. However, the difference between a verdict and what the members of this court would allow is not the measure of excessiveness. The verdict was approved by the trial judge who is properly "clothed with a latitude of discretion in dealing with this issue. As a partici-

pant in the original proceedings the trial court is best qualified to accurately judge the forces that shaped the verdict of the jury and can most readily sense the influence of passion and prejudice in an excessive verdict. For this reason, when such a verdict is set aside by a trial court, an appellate court is reluctant to disturb its ruling. For the same reason, a reviewing court should be equally cautious in dealing with a verdict the trial court has approved." Tufty v. Sioux Transit Co., 70 S.D. 352, 17 N.W.2d 700. This court has no standard by which to judge the reasonableness of a verdict and our review is governed by the often quoted rule appearing in Schuler v. City of Mobridge, 44 S.D. 488, 184 N.W. 281, as follows:

"The damages, therefore, must be so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption."

Tested by that rule of review we cannot say the verdict is so excessive or unreasonable as to require a new trial.

Affirmed.

All the Judges concur.