**YOUNGS DRUG PRODUCTS CORPORATION, Plaintiff-Appellee,**

v.

**DEAN RUBBER MANUFACTURING CO., a Partnership, Defendant-Appellant.**

**No. 15476.**

United States Court of Appeals Seventh Circuit.

June 16, 1966.

Rehearing Denied July 20, 1966.

David Skeer, Kansas City, Mo., Joseph D. Block, Chicago, Ill., for appellant, Sheffrey, Ryder & Skeer, Kansas City, Mo., Aaron, Aaron, Schimberg & Hess, Chicago, Ill., of counsel.

Philip W. Tone, Jerold S. Solovy, Donald R. Harris, Joseph A. Spitalli, Chicago, Ill., for appellee, Raymond, Mayer, Jenner & Block, Chicago, Ill., of counsel.

Before HASTINGS, Chief Judge, and KILEY and MAJOR, Circuit Judges.

KILEY, Circuit Judge.

Defendant, Dean Rubber Manufacturing Co., a Missouri partnership, appeals from an adverse judgment of $400,000.-00 [1] for its unfair competition with Youngs Drug Products Corporation of New York, and awarding Youngs a permanent injunction prohibiting similar conduct as an unlawful interference with Youngs' business. We affirm.

Dean contends that the court erred in failing to grant its motion for judgment, and in rulings on evidence and on amendment of the complaint.

Dean and Youngs are competitors for the drugstore prophylactic trade in the

---

1. $200,000.00 actual and $200,000.00 punitive damages.

United States. The approximate annual retail sales volume of prophylactics in this country is $100,000,000.00. About fifty per cent of these sales are made through the approximately 55,000 retail drug stores in the nation, and the other fifty per cent through non-drug store channels and vending machines. The retail druggists are antagonistic to their non-drug store competitors for this trade and support the manufacturers having a distribution policy limiting sales to drug stores. Because of the uncertain popular climate for the trade, sales of the merchandise depended upon salesmen, good will of the druggists[2] and advertising limited to trade periodicals.

Dean is a partnership in which Wilbur Dean and his wife had, at the time pertinent to this litigation, at least an 88.3% interest. He also owned virtually all of the voting stock of Dean Rubber Company of Puerto Rico, from which the partnership bought all of its prophylactics. He dominated both. Dean distributed its products through distributors and sales representatives, who then sold to drug stores, and in some cases to sundry stores. Dean of Puerto Rico sold prophylactics also to vending machine distributors and other non-drug store outlets.

Youngs sold its product virtually exclusively to retail and wholesale drug stores through a sales system of eleven district sales managers and ninety-seven salesmen. Youngs selects as distributors only those wholesale druggists who it believes will carry out its "drugstore-only" policy, which has been in effect for about forty years.

Paul Paradise, an original defendant, operated a sole proprietorship in the prophylactic trade which he eventually caused to be incorporated in 1957 under Illinois law. The corporation was named National Sanitary Laboratories, Inc. It distributed its merchandise through vending and other non-drug store outlets. Paradise, in the spring of 1957, arranged with Wilbur Dean to purchase bulk prophylactics from Dean of Puerto Rico for distribution through vending machines and non-drug store outlets. This arrangement, Wilbur Dean told Paradise, would enable them to "hit both" the drug store and non-drug store and vending machine markets. Later Paradise became Dean's Chicago distributor, and organized Dean of Chicago,[3] an Illinois corporation. He served as president of both National and Dean of Chicago. And from 1957 until December, 1960, defendant-Dean, Dean of Puerto Rico, National, Dean of Chicago, Wilbur Dean, and Paradise, with the aid of the bulk purchasing arrangement, "hit both sides of the trade."

In the summer of 1958 Paradise, after discussion with, and advice from, Wilbur Dean, filed an anti-trust action, in his name and National's, for $30,000,000.00 damages against Youngs and others as conspirators. The design of the alleged conspiracy was stated to be the passage of, and operation under, drug store-only prophylactic laws.[4] In reaction to the suit, Youngs issued a press release to the trade, and Dean of Chicago and National filed a libel suit based on the release.[5]

Youngs' release, dated July 3, 1958, informed the trade, in effect, that National, "a prophylactic slot machine operator, * * * and its predecessor," Paradise, had filed the suit as a means of curbing the drug store trade, "foreshadowing"

2. Since many customers (25% to 80%, depending on the area involved) purchase on "open calls," i. e., without specifying brand names, the good will of the individual pharmacist is highly important.

3. This court, on March 9, 1966, on stipulation, dismissed the appeals of Paradise, National and Dean of Chicago, in Cause No. 15477. They have been held jointly and severally liable in the judgment affirmed in this appeal.

4. On July 20, 1961, Youngs' motion for judgment on the pleadings in the anti-trust action was allowed and an appeal by Paradise later dismissed.

5. Youngs' motion to dismiss was allowed December 30, 1959. The court here found that the release was factual and truthful, and issued with good motive and justifiable ends.

an attempt to legalize and increase the distribution of prophylactics through vending machines in non-drug store establishments. Defendant-Dean countered the release by circulating, commencing in August, 1958, a falsified document purporting to be "portions of the findings of the federal trial examiner" in a proceeding in December, 1949, before the Federal Trade Commission, entitled "In the Matter of Youngs Rubber Corporation."

This document contained, *inter alia*, "findings" to the effect that Youngs had falsely represented that sales of its products were limited to the "retail prescription drug store" trade; that Youngs actually sold merchandise to some 26,000 retail stores not licensed as prescription drug stores, and knew its products could be purchased in cigar stores, candy stores, etc.; and that it sold to these non-drug store outlets "second grade" products.[6]

These statements were not findings of the FTC examiner, but were "proposed findings" prepared by Dean from proposals of the attorney prosecuting the complaint, or from the complaint filed before the Commission. In fact, the examiner proposed findings that Youngs sold but one grade of product, not "seconds," and that Youngs restricted its sales to drug stores only. The "full Federal Trade Commission" stated, *inter alia*, that Youngs "used its best efforts to maintain its 'sales-through-drug-stores-only' policy," and dismissed the complaint.

The document contained also what purported to be a cease and desist order against Youngs. This language had been rejected by the FTC in 1952. Dean knew, when it drafted the document and circulated it in the trade, that it was "spurious, false and fraudulent." Its salesmen used the document in soliciting drug store business and represented to numerous pharmacists, as Dean had told them, that the document contained the actual FTC findings. In May, 1962, Dean persisted in circulating "An Open Letter to Retail Pharmacists," reiterating by implication the false statements in the document of August, 1958, which was said not to "convey an untruthful or misleading impression."

In February of 1958, Youngs sold a quantity of its product to an exporter for shipment to Korea. Each prophylactic bore Youngs' name and legend. Without Youngs' knowledge the exporter diverted this shipment to one Moore in the United States who, after unsuccessful attempts to sell the merchandise in bulk, arranged, through Paradise, in the summer of 1958, to have some of the merchandise packaged under the name "Snaps." Moore continued to have difficulty in selling the packages, and finally sold 1,750 gross of bulk prophylactics to Paradise.

A conspiracy was formed before September, 1958, between Wilbur Dean, the Dean partnership, and the other defendants, to fabricate further evidence to injure Youngs in the trade by showing Youngs did not practice the drug store-only policy. The conspirators, with the help of a Dean partner named Fry, and M & M, a Missouri corporation closely associated in the prophylactic business, had the 1,750 gross which Paradise purchased packaged for vending machines. These packages are customarily sold through vending machines, occasionally through other non-drug store outlets, and almost never through drug stores; of this druggists were well aware. Each article of the merchandise, packaged under various labels by the Missouri corporation, bore the Youngs legend. These packages were delivered to Dean and sent by Dean to every one of its distributors, district men and sales representatives, in October, 1958, with a false written statement that the merchandise was found in vending machines and sundry non-drug store locations. The false document relating to the FTC proceeding was also sent with this material.

6. Dean prepared and used two versions of this "FTC document," which were identical except that one did not contain the reference to sale of "second grade" prophylactics.

Dean distributors used the material in soliciting business and were able to persuade "many druggists" that plaintiff did not distribute only to the drug store trade. The court found that as a result of defendants' conduct Youngs suffered a loss of business. The goal of the unlawful conspiracy was reached.

The court also found that defendants' conduct was actuated by malice, intended to discredit plaintiff and injure its business; that defendants have persistently maintained that their wrongful conduct "was not wrongful, or actionable"; and that Dean's sales people have continued to use the false FTC document and vending machine packages long after the filing of this suit.

Dean contends, as it did in the district court, that plaintiff has failed to prove a cause of action.

We agree with Youngs that the unfair competition shown here involved malicious tortious interference with a property right of Youngs which caused irreparable harm and threatened continued irreparable harm. This was substantially the conclusion of the district court which is not challenged as erroneous. Dean's unlawful, unfair and malicious conduct was the successful conspiring to use, and the use of, trade libels upon Youngs to destroy as far as possible its drug store business.

Both Dean and Youngs rely upon Downey v. United Weatherproofing Inc., 363 Mo. 852, 253 S.W.2d 976 (1953), for the Missouri rule. We think that the decision of the Supreme Court of Missouri in that case controls our decision here. As in the third count in the complaint there, so in the two counts in Youngs' complaint, the "gist or gravamen of plaintiff['s] claim * * * is for relief against the continuing violation of their property rights." 253 S.W.2d at 983. It is true that the main thrust of the count there discussed by the court was the defendants' alleged wrongful inducement of breaches of existing contracts by unfair means. But the opinion leaves no doubt in our minds that the

Missouri Supreme Court thought that "prospective customers," as well as "existing contracts," are well within the protection of the rule of equity, applied by the court, covering "willful, malicious continuing and irreparable injury to a property right," and that the Missouri court would so hold if the precise issue before us were raised before it.

The Dean libels in themselves are not the basis for the injunction. They were the means by which Dean attempted to accomplish the wrong against Youngs' right to conduct its business without unjustified interference. Downey v. United Weatherproofing Inc., 253 S.W.2d at 983. The court in *Downey*, in stating the rule we have just paraphrased, distinguished Flint v. Hutchinson Smoke Burner Co., 110 Mo. 492, 19 S.W. 804, 16 L.R.A. 243 (1892), relied upon by Dean to preclude Youngs' relief as an injunction to enjoin a libel. The suit here is not "primarily" to enjoin a libel, as in *Flint*. The injunction issued by the district court operated against the conspiratorial conduct to protect Youngs' business right, the gravamen of Youngs' action, not merely against the libels involved.

In Shaltupsky v. Brown Shoe Co., 350 Mo. 831, 168 S.W.2d 1083 (1943), relied on by Dean, the complaint merely alleged independent lawful acts of the alleged conspirators and did not allege the independent common law tort of conspiracy for which mere force of numbers acting together may make a wrong. 168 S.W.2d at 1086. The case before us is different. Dean's acts were unlawful.

We conclude on this point that the district court did not err in failing to enter judgment for Dean and in granting, under its equity powers, the injunction against Dean. In view of that conclusion we do not reach the challenge to the allowance of damages in "a court of equity," which argument is predicated on the erroneous theory that plaintiff failed to prove a case for injunctive relief.

The only findings which Dean challenges are those with respect to the extent of the damage Youngs suffered, and to Dean's defense of unclean hands.

The court found that the unfair competitive conduct of the conspirators resulted in a sales loss to Youngs in 1958 of 76,850 gross of prophylactics, with a corresponding loss of profits of about $250,000.00; that Youngs incurred additional expenses of $6,386.10 it would not have had but for that unfair conduct; that after the year 1958 Youngs continued to suffer irreparable and permanent harm incapable of accurate measure in damages; that the unfair competitive conduct to injure Youngs' business was malicious; and that in determining the amount of punitive damage due Youngs, its attorneys' fees of $180,323.75 should be considered as a factor.

The only proof of damages was by documentary summaries or damage schedules prepared primarily from monthly operating statements or summaries. Dean argues this evidence was inadmissible as violating the best evidence rule. It claims also that it was denied the opportunity to inspect the original records and to cross-examine with respect to the accuracy of the underlying "work sheets."

■ We see no merit to Dean's contention. The preparation of the damage summaries was shown by the witness who prepared the exhibit to have been from audited monthly statements made from records kept in the regular course of business. He was subjected to extensive cross-examination. Youngs' comptroller, who assisted the accountants in completing the audit and preparing the statements, testified and was cross-examined. The statements were used in regular course for declaration of dividends, annual reports and federal income tax returns. The statements underlying the damage summaries were introduced for use in cross-examination by a co-defendant of Dean without objection by the latter. We conclude that the documentary summary entitled "Computation of Shipments Lost, 1958" was admissible

as a summary of transactions, constructed from monthly statements made in the regular course of Youngs' business. 28 U.S.C. § 1732. The district court could properly infer that the statements were made within a month after the transactions and therefore "within a reasonable time," and that on the whole there was sufficient verification of the statements and the "Computation."

■ The court also was justified, after weighing the evidence with respect to the "Computation," in determining that it disclosed the probable losses suffered beginning in August, 1958, when Dean began inflicting the injury against Youngs' business; and that the losses as damages amounted to $200,000.00 and were attributable to the injury. The proof of actual damages was sufficiently precise to support an award of $200,000.00 actual damages. The court was not required to find that the losses did not occur due to defendants' conduct, even though plaintiff's sales volume tended to increase after August of 1958—and thus the overall sales decrease for that year might be said to have occurred before the acts by defendants.

That fact was explained to the district court's satisfaction by testimony concerning market conditions during the time in question—including two 1957 price increases, one by Youngs and the other by a major competitor. We have not been persuaded that the court's findings on actual damage are clearly erroneous.

■ Dean argues that a court of equity cannot award punitive damages. The Supreme Court of Missouri said, in Bellerive Country Club v. McVey, 365 Mo. 477, 284 S.W.2d 492, 503 (1955), "the allowance of punitive damages is always discretionary." See also Cirese v. Spitcaufsky, 265 S.W.2d 753, 759–60 (Ct. App.Mo.1954). And this court in Aladdin Mfg. Co. v. Mantle Lamp Co. of America, 116 F.2d 708, 716 (7th Cir. 1941), said: "Inasmuch as the jurisdiction of a court of equity had attached here, it had jurisdiction, in order to fur-

nish full relief, to grant everything that might be recovered at law. \* \* \* If the facts warranted, exemplary or punitive damages were properly allowed." Since "Defendants' conduct was actuated by malice," (Finding #60), the facts warranted, and we think the court had power to award, punitive damages.

■ Dean has not persuaded us that the district court abused its discretion in allowing Youngs to amend its complaint to name M & M Co. of Missouri as a conspirator. The original complaint alleged that the originally named defendants in conspiracy "with other persons unknown to this plaintiff, proceeded to package or caused to be packaged" the merchandise which was diverted from exportation to achieve Dean's malicious purpose. The evidence showed M & M's part in this conduct and Dean knew of that participation. We agree with plaintiff that no abuse of discretion and no prejudice has been shown, for the amendment was not essential because the original complaint accommodated the evidence of M & M's participation.

■ Finally Dean challenges the finding against it on the issue of its defense of Youngs' "unclean hands." Dean argues that Youngs started the fight for the drug store trade with the exploitation of the Paradise suit against Youngs and that Dean's retaliation was justified. We look beyond this dog-eat-dog theory of competition. The district court found that Youngs' stratagem, in using to advantage the luckless suit by Paradise, was not based on lies, and that Dean showed no "unclean hands" conduct on Youngs' part. That finding is not clearly erroneous.

We have disposed of all points made with respect to the judgment and injunctive relief for Youngs. No showing has been made in this court that the district court erred in dismissing Dean's counterclaim based on alleged libel in Youngs' release covering the anti-trust suit by National and Paradise.

The judgment is affirmed.