Shirley A. BLACK, as Guardian of the
Person and Estate of Charlotte E.
Black, Plaintiff and Appellee,

v.

Charles GARDNER and Evelyn Gardner,
Defendants and Appellants.

No. 13443.

Supreme Court of South Dakota.

Argued Jan. 18, 1982.

Decided June 2, 1982.

John J. Delaney of Amundson & Fuller, Lead, for plaintiff and appellee.

Gregory A. Eiesland and Gary D. Jensen of Lynn, Jackson, Shultz & Lebrun, P. C., Rapid City, for defendants and appellants.

DUNN, Justice (on reassignment).

This case involves a series of gifts given by Charlotte Black (Charlotte) to appellants Charles and Evelyn Gardner (hereinafter referred to individually as Charles and Evelyn respectively or jointly as Gardners). Appellee Shirley Black (Shirley), as guardian of the person and estate of Charlotte, claims these gifts resulted from the exercise of fraud and undue influence on Charlotte by Gardners. She also claims that these gifts were obtained by Gardners willfully, wantonly, maliciously and fraudulently from Charlotte. Shirley prayed for recovery of actual damages and punitive damages. The jury found for Shirley, and a judgment was entered in the sum of $244,-922.99 for actual damages and the sum of $100,000.00 for punitive damages, plus prejudgment interest. We affirm the judgment.

Charlotte and Harold Black (Harold) were married in the early 1900s and lived in Deadwood, South Dakota during most of their married life. Three children were born of this marriage: Evelyn, Vernon, and Shirley. Harold developed a very successful creamery and beer distributing business. Charlotte primarily worked as a housewife and mother.

The children soon married and moved from Deadwood. Evelyn married Charles Gardner, who was a career United States Air Force officer, and they lived on various military installations. Vernon married Mary Black and lived in Belle Fourche, South Dakota. Vernon was killed in a boating accident in 1963 and was survived by three children. Shirley married Stanley Parsons and they lived in Kansas City, Missouri. The children frequently kept in contact with their parents.

When Harold died in 1959, he left an estate of approximately $500,000.00. His estate was left to his wife Charlotte in two testamentary trusts of approximately equal value. Charlotte had access to and control over the income and principal of one trust and the income generated by the second trust. The principal of the second trust was to be divided in equal one-third shares to Evelyn, Vernon, and Shirley or their respective children upon Charlotte's death. Charlotte also had holdings of her own valued at approximately $200,000.00 at the time of Harold's death.

Prior to Harold's death, he usually gave $3,000.00 annually to each of his children. Charlotte continued giving a gift of $3,000.00 per year per child after Harold's death. Until 1973, she made no investments and engaged in no financial dealings other than depositing her dividends and other income into her savings account.

In 1967, Charles Gardner retired from the Air Force. He and his wife Evelyn moved to Rapid City, South Dakota. Charlotte was in her middle seventies. By 1972, her advancing age made it difficult for her to handle many of her daily chores, so the Gardners moved to Lead, South Dakota to assist Charlotte. They helped Charlotte with the household duties, did her laundry, drove her to the doctor and assisted with her banking matters.

Shirley and her husband were divorced in 1973 and Shirley requested her maiden name of Black be reinstated. Shirley had severe emotional problems during this time, and reached out to Evelyn and Charles for support. In March of 1974, Shirley entered the hospital for psychiatric treatment.

Gardners drove Charlotte to Attorney David Morrill's office on November 14, 1973. Charlotte subsequently executed a will bequeathing her estate in thirds to Evelyn, Shirley, and Vernon's children. Morrill suggested to Charlotte that she could obtain considerable estate tax savings if she made substantial gifts. They did not discuss specific gifts.

In December of 1973, Charlotte began making a series of large gifts to Gardners: $40,000.00 in December of 1973, $40,000.00 in January of 1974, and approximately $100,000.00 in March of 1974. These transactions are discussed in detail later in the opinion. Gardners testified that one of the reasons they received these gifts was because Charlotte believed Shirley was incapable of handling her affairs as a result of her mental condition.

On March 28, 1974, Charlotte again met with Morrill. Her will was subsequently changed to leave most of her estate to Evelyn, with Shirley and Vernon's children being totally disinherited.

During this period of time, Evelyn's mental health deteriorated. In May of 1976, she was hospitalized for psychiatric treatment. Charles testified that Charlotte felt partially responsible for Evelyn's failing mental health and thus gave them two more gifts—a diamond necklace worth $5,500.00 and $32,700.00 worth of Homestake Mining Company stock.

While Evelyn was hospitalized, Shirley went to Deadwood to take care of her mother. Shirley discovered that Charlotte's savings account had decreased by $127,000.00 since 1971. She took her mother to see Morrill. After private discussions with Charlotte, Morrill drew up a living trust and another will. Charlotte's will returned to the former distribution of her estate by thirds. The living trust took title to all her real and personal property.

In January of 1978, Charlotte moved in with Gardners because she was unable to care for herself. A letter to the trust company dated March 17, 1978, typed by Evelyn, requested that Charlotte's three trusts be terminated. This request was denied. Evelyn then prepared a general power of attorney appointing Charles as Charlotte's attorney and authorizing him to terminate her trusts. The power was delivered to the trust company by Charles. The power was not honored. In May of 1978, Charlotte moved to a nursing home.

Shortly thereafter, Shirley began guardianship procedures and this litigation ensued

after an investigation of Charlotte's finances. Both parties consented to a trial by jury.

■ While there has been no objection by either party, we are met with the threshold question of whether this equity action,[1] with full consent of the parties, was properly submitted to a jury for a binding verdict. If not, the verdict would be advisory only, and the case should be remanded to the trial court for findings of fact and conclusions of law.

The case was submitted to the jury under the authority of SDCL 15–6–39(c) which states: "In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury, or the court, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right." SDCL 15–6–39(c) was adopted by an order of this court as a court rule, effective July 1, 1966. It was part of this court's adoption of the Federal Rules of Civil Procedure. It is presumed that the rule was adopted with full knowledge of the 1926 case of *State v. Nieuwenhuis*, 49 S.D. 181, 207 N.W. 77 (1926), which found a similar provision in the probate code unconstitutional as taking away the prerogative of a trial judge in an equitable action. It is also presumed that the court adopted the Federal Rules of Civil Procedure with the meaning previously given to those federal rules by the federal courts. *See In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970).

The federal courts, including the Eighth Circuit Court of Appeals, have upheld this

---

1. *But see Redford v. Weller*, 27 S.D. 334, 131 N.W. 296 (1911), where this court upheld a jury verdict for damages based on undue influence under Section 1204 of the Revised Civil Code of 1903. This section has been brought forward into the present code as SDCL 53–4–7, which reads as follows:

Undue influence consists:
(1) In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; or

(2) In taking an unfair advantage of another's weakness of mind; or
(3) In taking a grossly oppressive and unfair advantage of another's necessities or distress.

This case has never been overruled or modified.

This action could well have been maintained as a law action under this section of the code as no equitable relief was prayed for; the suit was for damages only; and overt actions of misconduct and undue influence were alleged and proved. *See* D. Dobbs, Remedies (1973), p. 680.

rule. *Security Mutual Cas. Co. v. Affiliated FM Insurance Co.*, 471 F.2d 238 (8th Cir. 1972); *Stockton v. Altman*, 432 F.2d 946 (5th Cir. 1970). Our neighboring state of North Dakota, under a similar rule, has likewise held that a jury verdict in an equitable action, consented to by the parties, has the same effect as if the trial by jury had been a matter of right. *Sprenger v. Sprenger*, 146 N.W.2d 36 (N.D.1966).

We now hold that SDCL 15–6–39(c) should be given full effect and that the verdict rendered by the jury after the parties had consented to a jury trial is all that is necessary to support the judgment. To the extent that this holding is inconsistent with *Nieuwenhuis, supra*, and the decisions based thereon, they are specifically overruled.

Gardners contend that the trial court erred in refusing to grant their motion for directed verdict on the ground that the evidence of undue influence was insufficient to submit the case to the jury. We disagree.

 The trial court, when ruling on a motion for directed verdict, must consider the evidence in the light most favorable to the nonmoving party and grant to the nonmoving party the benefit of every reasonable inference in their favor. A motion for directed verdict is properly denied if there is substantial evidence introduced at trial that would allow reasonable minds to reach differing conclusions. *Martino v. Park Jefferson Racing Ass'n*, 315 N.W.2d 309 (S.D. 1982); *Lytle v. Morgan*, 270 N.W.2d 359 (S.D.1978); *Heiser v. Rodway*, 247 N.W.2d 65 (S.D.1976).

 "Under certain circumstances, a confidential relationship can give rise to a presumption of undue influence." *Matter of Estate of Pierce*, 299 N.W.2d 816, 819 (S.D. 1980). These circumstances require the contestants to prove by a preponderance of the evidence that the beneficiary actively participated in the questioned transactions and unduly profited therein. *See Matter of Estate of Weickum*, 317 N.W.2d 142 (S.D. 1982); *Matter of Heer's Estate*, 316 N.W.2d

806 (S.D.1982); *Matter of Estate of Pierce, supra; In re Estate of Anders*, 88 S.D. 631, 226 N.W.2d 170 (1975).

In the case before us, Gardners admitted that a confidential relationship existed between them and Charlotte. After 1972, Gardners took an active role in assisting Charlotte, who was in her late seventies, with her needs. Gardners assisted in the housekeeping and laundry tasks. They drove Charlotte to see various doctors and took her on trips with them. Gardners assisted Charlotte with her banking and investment matters; including writing the body of numerous checks for her signature, taking over the bookkeeping responsibilities, and making appointments to speak to investment advisors and attorneys. The evidence indicates that a confidential relationship existed between Charlotte and Gardners at the time of the questioned transactions.

The evidence also indicated that Gardners actively participated in the questioned transactions and unduly profited therein. In December of 1973, Charles transferred $40,000.00 from Charlotte's savings account to her checking account. Neither Charles nor Evelyn were authorized to withdraw funds from Charlotte's savings account. Immediately thereafter, a $40,000.00 check payable to Merrill, Lynch, Pierce, Fenner & Smith was written by Charles and signed by Charlotte. In January of 1974, Evelyn authorized the transfer of another $40,000.00 from Charlotte's savings account to her checking account. Subsequently, a second $40,000.00 check payable to Merrill, Lynch, Pierce, Fenner & Smith was written by Charles and signed by Charlotte. Gardners claim that both of these transactions were gifts to them from Charlotte. Charles contacted Morrill, who prepared two gift tax returns for these transactions.

In March of 1974, Charles took Charlotte to Rapid City to see George Chell about investing in mutual funds. Chell had previously handled some investments for Charles. After two meetings with Charles, Evelyn, and Charlotte, the decision was made to invest $100,000.00 in mutual funds.

Chell testified that Charlotte said very little and Charles was the primary decision-maker. On March 6, 1974, a purchase in the joint names of Charlotte and Evelyn was made in the amount of $50,011.00. A second purchase in the amount of $50,000.00 was made on March 16, 1974. On March 20, 1974, an account in the names of Charles and Evelyn was opened. On the authority of an executed blank stock assignment power, Charlotte's mutual funds plus earnings were transferred to Charles and Evelyn, effective April 15, 1974. All records regarding this mutual fund were sent to Gardners. In order to make this investment, Charlotte borrowed $36,000.00 from her bank.

Charles again contacted Morrill to prepare the gift tax returns. He indicated to Morrill that the transfer occurred on December 23, 1974 instead of the actual date of transfer, April 15, 1974. The value of the mutual fund shares had declined by $2.77 per share, thus the gift value was under-reported by $28,769.22.

The $36,000.00 bank note was due in 1975. Gardners sold some of Charlotte's blue chip stock, through the use of a stock power, and cashed a $6,000.00 certificate of deposit to pay the note.

In May of 1976, two more transactions occurred. First, a diamond gift, purchased for $5,500.00, was given to Evelyn. Second, 872 shares of Homestake Mining Company stock, valued at $32,700.00, were given to Charles. Charles testified at trial that both of these gifts were to help pay Evelyn's hospital expenses. No gift tax returns were filed on either of these gifts.

Finally, in 1977, a camper top was purchased for Gardners for $310.96. Also, five checks signed by Charlotte, each in the amount of $333.36, were made payable to Arizona Title Insurance for the partial purchase of some land for Gardners.

■ Viewing this evidence in the light most favorable to the non-moving party, we find that substantial evidence was introduced at trial on the issues of Gardners' active participation in the questioned transactions and that they unduly profited from the transactions which warranted the submission of this case to the jury. The trial court did not err in refusing to grant Gardners' motion for directed verdict.[2]

Gardners contend that the trial court erred in instructing the jury. First, they claim two instructions should have been given which state that evidence of Charlotte's obtaining independent legal advice, which was neither incompetent nor perfunctory, shows that her gifting was not the result of the exercise of undue influence.

■■ The trial court has a duty to instruct the jury on the law applicable to a particular case. *Jahnig v. Coisman*, 283 N.W.2d 557 (S.D.1979); *Egan v. Sheffer*, 86 S.D. 684, 201 N.W.2d 174 (1972). Only those issues which are supported by competent evidence, however, should be presented to the jury. *Ryken v. Blumer*, 307 N.W.2d 865 (S.D.1981); *Wolf v. Graber*, 303 N.W.2d 364 (S.D.1981); *Olesen v. Snyder*, 277 N.W.2d 729 (S.D.1979).

Morrill's first contact with Charlotte was on November 14, 1973. Prior to that time, Charlotte conducted all her legal affairs with attorney Robert Driscoll; however, he

**2.** In light of our holding that substantial evidence was introduced at trial regarding the presumption of undue influence arising out of a confidential relationship, we need not determine whether substantial evidence was introduced to prove the four elements of undue influence as set forth in *Matter of Estate of Weickum, supra.* Testimony regarding a lawsuit brought by Michael Black against Charles Gardner claiming misappropriation of partnership funds was also received into evidence at trial. Gardners claim this evidence is inadmissible under SDCL 19–12–5 to prove the third element of the undue influence test, namely,

Charles' propensity to exert undue influence over Charlotte. We decline to address this issue because we are not applying the four-part undue influence test and because Charles has failed to meet his burden of showing not only error, but also prejudicial error to the effect that under the evidence, the jury might and probably would have returned a different verdict if the evidence had been excluded. *Watkins v. Ebach*, 291 N.W.2d 765 (S.D.1980); *Alberts v. Mutual Service Casualty Insurance Co.*, 80 S.D. 303, 123 N.W.2d 96 (1963). *See also Lytle v. Morgan*, 270 N.W.2d 359 (S.D.1978).

was unavailable at the time in question. Charlotte decided to use the Gardners' attorney, Morrill, and Gardners drove her to his office.

Charlotte indicated to Morrill, during their private discussion on November 14, 1973, that she wanted to draft a will leaving her estate in thirds to Shirley, Evelyn, and the issue of Vernon. Morrill suggested that she make gifts to her heirs for estate planning purposes. Charlotte did not indicate to Morrill that she intended to follow his suggestion, nor to whom she would give gifts if she decided to establish a gift-giving policy. On November 15, 1973, Charlotte executed her will.

Charlotte did not have further contact with Morrill until March 28, 1974. Prior to this March meeting, Charlotte gave gifts to Gardners of $80,000.00 through the Merrill, Lynch transactions and over $100,000.00 through the mutual funds transactions without consulting Morrill about the specific transactions. Morrill's only role was to prepare the gift tax returns at Charles' request. On March 28, 1974, Gardners again drove Charlotte to Morrill's office. In a private conversation with Morrill, Charlotte indicated that she wanted to execute a new will disinheriting all her relatives except Gardners. This will was subsequently executed. Morrill testified that he did not discuss with Charlotte the merits of any particular gifts and in fact had no knowledge of particular transactions until they were completed and Charles requested him to prepare gift tax returns.

 This court has recognized that the cloud of undue influence may be removed by showing that the one allegedly overpersuaded had independent advice that was neither incompetent nor perfunctory. *Davies v. Toms*, 75 S.D. 273, 63 N.W.2d 406 (1954). In this instance, however, the evidence indicates that Charlotte neither requested nor was given advice regarding the propriety of specific gifts. Just as in *Davies, supra*, the attorney's role here was not as a counselor but rather as a draftsman. The evidence presented at trial regarding independent legal advice was insufficient to support Gardners' two requested jury instructions. We find that the trial court did not err in denying these instructions.

 Second, Gardners contend that the trial court should have instructed the jury that a presumption of undue influence is rebutted either by showing that Charlotte "had competent and disinterested advice prior to giving the gifts at issue" or that she "gave the gifts voluntarily, deliberately and advisedly, knowing their nature and effect."

The trial court in instruction number 7 advised the jury that:

> You are instructed that the existence of a confidential relationship, such as that existing between Charlotte Black and Evelyn and Charles Gardner, has been admitted by Evelyn and Charles Gardner. Charles and Evelyn Gardner have the burden of going forward with evidence to show that they took no unfair advantage of that relationship.

We have previously held that a presumption of undue influence arising from a confidential relationship can be rebutted by evidence indicating that the beneficiary took no unfair advantage of his dominant position. *Matter of Estate of Nelson*, 274 N.W.2d 584 (S.D.1978); *In re Estate of Melcher*, 89 S.D. 253, 232 N.W.2d 442 (1975); *In Re Metz' Estate*, 78 S.D. 212, 100 N.W.2d 393 (1960). Evidence sufficient to rebut the presumption of undue influence requires proof of more than the fact that competent and disinterested advice was given or that the gifts were given voluntarily. In addition, as we previously held, the perfunctory consultations with Morrill were not sufficient to rebut a presumption of undue influence. We find that the trial court did not err in refusing the requested instruction.

 Third, Gardners contend that the trial court should have given the following jury instruction:

> You are further instructed that in a case such as this, where Plaintiff relies largely on circumstantial evidence and evidence of suspicious circumstances alone, in order to establish undue influence invali-

dating a gift, there must be proof that the circumstances surrounding the gifting were inconsistent with any hypothesis but undue influence.

This proposed instruction is not an accurate statement of the law. We have consistently held since *Parham v. Dell Rapids Township in Minnehaha County*, 80 S.D. 281, 122 N.W.2d 548 (1963), that circumstantial evidence in a civil case need not be inconsistent with all other possible explanations that the ingenuity of counsel might suggest. *Shaffer v. Honeywell, Inc.*, 249 N.W.2d 251 (S.D.1976); *Engberg v. Ford Motor Company*, 87 S.D. 196, 205 N.W.2d 104 (1973); *Weidner v. Lineback*, 82 S.D. 8, 140 N.W.2d 597 (1966). Secondly, the greater part of the evidence received was not circumstantial. Direct proof was presented concerning the larger transactions, and the manner in which the money was transferred from one account to another, eventually ending up in the Gardners' purses. The trial court did not err in refusing the instruction.

■ Fourth, Gardners claim seven other alleged jury instruction errors. Jury instructions are adequate, if, when considered as a whole, they correctly state the law applicable to the case. *Jahnig v. Coisman, supra; Mueller v. Mueller*, 88 S.D. 446, 221 N.W.2d 39 (1974); *Pollman v. Ahrens*, 88 S.D. 249, 218 N.W.2d 475 (1974). After reviewing the alleged errors, we find that the instructions sufficiently and correctly stated the law applicable to this case. Thus, the trial court did not err in instructing the jury.

■ Gardners made a motion to reopen the trial after both parties had rested for the purpose of introducing into evidence their wills to corroborate Evelyn's testimony. Their motion was denied and Gardners claim this refusal was an abuse of judicial discretion. These wills had been in the possession of Gardners for over twenty years. This was a factor considered by this court in *Myron v. Coil*, 82 S.D. 180, 143

N.W.2d 738 (1966), in upholding the decision of the trial judge denying appellant's motion to reopen his case. We find that the trial judge did not abuse his discretion.

■ Gardners contend that the award of punitive damages should not be allowed in this case in view of an old rule which held that such damages were not recoverable in an equitable action.[3] *See* D. Dobbs, Remedies (1973), p. 211. This rule is more archaic than the rule not permitting a binding jury verdict in an equitable action where all parties had consented to a jury trial. The modern trend, however, allows a recovery of punitive damages in an equitable action. *See Youngs Drug Products Corp. v. Dean Rubber Mfg. Co.*, 362 F.2d 129 (7th Cir. 1966); *Investors Preferred Life Insurance Co. v. Abraham*, 375 F.2d 291 (10th Cir. 1967); *Martin v. Swenson*, 335 F.Supp. 765 (W.D.Mo.1971); *Hubbard v. Superior Court of Maricopa County*, 111 Ariz. 585, 535 P.2d 1302 (1975); *Rivero v. Thomas*, 86 Cal.App.2d 225, 194 P.2d 533 (1948); *General Refractories Co. v. Rogers*, 240 Ga. 228, 239 S.E.2d 795 (1977); *Hedworth v. Chapman*, 135 Ind.App. 129, 192 N.E.2d 649 (1963); *Holden v. Construction Machinery Company*, 202 N.W.2d 348 (Iowa 1972); *Tahoe Village Realty v. DeSmet*, 590 P.2d 1158 (Nev.1979); *I.H.P. Corp. v. 210 Central Park South Corp.*, 12 N.Y.2d 329, 239 N.Y.S.2d 547, 189 N.E.2d 812 (1963); *Eakman v. Robb*, 237 N.W.2d 423 (N.D. 1975); *Z. D. Howard Company v. Cartwright*, 537 P.2d 345 (Okl.1975); *Kneeland v. Bruce*, 47 Tenn.App. 136, 336 S.W.2d 319 (1960); *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex.1963).

This trial proceeded under SDCL 15–6–39(c) which states that "the court, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if the trial by jury had been a matter of right." No one could disagree that in a case where the evidence warrants it, an award of punitive damages is proper

---

**3.** A personal representative, who sues or continues a suit on a cause of action in favor of his decedent, can recover the same damages including punitive damages as the decedent might have recovered on as much of the cause of action as survives. *Worrie v. Boze*, 198 Va. 891, 96 S.E.2d 799 (1957).

where there is a "trial by jury as a matter of right."

█ This court has long recognized that "[w]hen an action is one of equitable cognizance, the right to grant full and complete relief, legal and equitable, attaches . . . ." *City of Sioux Falls v. Hossack*, 69 S.D. 21, 25, 5 N.W.2d 880, 882 (1942). *See also Parsons v. City of Sioux Falls*, 65 S.D. 145, 272 N.W. 288 (1937).

SDCL 21–3–2 providing for punitive damages reads:

In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, or in any case of wrongful injury to animals, being subjects of property, committed intentionally or by willful and wanton misconduct, in disregard of humanity, the jury, in addition to the actual damages, may give damages for the sake of example, and by way of punishing the defendant.

█ There is no limitation as to an equitable action in this statute. The only limitation is as to an action arising in contract. Thus, the better rule would be that we should look to the substance of the predicate action for a determination of whether punitive damages should be permitted. We can see no logical reason for permitting punitive damages for the tort of fraud and deceit in a law action, and foreclosing such damages for fraud and deceit in an equitable action.

We hold that the trial court properly submitted the issue of punitive damages to the jury.

█ Finally, Gardners contend that the award of $100,000.00 for punitive damages was excessive. We disagree. In *Hulstein v. Meilman Food Industries*, 293 N.W.2d 889 (S.D.1980), we noted that to accomplish the objective of punishing the wrongdoer and deterring others from similar wrongdoing, punitive damages must be relatively large. We then listed the following factors to be considered when determining the proper amount of punitive damages:

the amount allowed in compensatory damages, the nature and enormity of the wrong, the intent of the wrongdoer, his financial condition, and all of the circumstances attendant to his actions. We need not again reiterate the nature and enormity of the wrongdoings on the part of the Gardners; nor can there be any doubt of the Gardners' intent throughout these transactions. The evidence indicates that the Gardners had a present net worth in excess of $750,000.00 at the time of trial. Under the circumstances of this case, we find that the award of $100,000.00 for punitive damages was not excessive. It also should be noted that this recovery of $100,000.00 will go into Charlotte's estate, and that Gardners will recover one-third of the amount under Charlotte's final will.

We affirm the judgment of the trial court.

WOLLMAN, C. J., and MORGAN and HENDERSON, JJ., concur.

FOSHEIM, J., dissents.

FOSHEIM, Justice (dissenting).

The majority opinion does violence to constitutional law precedent in this state concerning equity jurisdiction.

Although admittedly grounded in equity, by agreement this case was treated as though trial by jury was a matter of right pursuant to SDCL 15–6–39(c), which reads:

In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury, *or the court, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right.* (emphasis supplied).

That statute is similar to R.C.1919 § 3564, which read:

When the appeal is on questions of fact, or on questions of both law and fact, the trial in the circuit court must be de novo and shall be conducted in the same manner as if the case and proceedings had originated in that court. All ques-

tions of fact arising upon such appeal shall be, at the request of any party to such proceedings, triable by jury, and general or special verdicts may be required by the court, which shall have the same force and effect as verdicts in actions at law.

In *State v. Nieuwenhuis*, 49 S.D. 181, 207 N.W. 77 (1926), we declared R.C.1919 § 3564 unconstitutional insofar as it allows "actions of law" effect to be given a jury verdict in equity cases. In *Nieuwenhuis*, we adopted this reasoning of the Supreme Court of Michigan construing a similar statute.

'The functions of judges in equity cases in dealing with them is as well settled a part of the judicial power, and as necessary to its administration, as the functions of jurors in common-law cases. Our Constitutions are framed to protect all rights. When they vest judicial power they do so in accordance with all of its essentials, and when they vest it in any court, they vest it as efficient for the protection of rights, and not subject to be distorted or made inadequate. The right to have equity controversies dealt with by equitable methods is as sacred as the right of trial by jury. * * *

'The system of chancery jurisprudence has been developed as carefully and as judicially as any part of the legal system, and the judicial power includes it, and always must include it. Any change which transfers the power that belongs to a judge to a jury, or to any other person or body, is as plain a violation of the Constitution as one which should give the courts executive or legislative power vested elsewhere. The cognizance of equitable questions belongs to the judiciary as a part of the judicial power, and under our Constitution must remain vested where it always has been vested heretofore.'

*Id.* 207 N.W. at 78 (quoting *Brown v. Kalamazoo Circuit Judge*, 75 Mich. 274, 42 N.W. 827 (1889)). In *Nieuwenhuis*, we remanded the case for findings of fact and conclusions of law stating that, as

this action [contest of a lost will] in the circuit court is in equity, governed by the rules of chancery practice, we adopt the reasoning in the case of *Brown v. Kalamazoo Circuit Judge*, supra, and hold that the verdict of the jury was advisory only, and that the statute concerning the effect of the verdict of the jury, in so far as it applies to actions in chancery, is unconstitutional and void.

*Id.* 207 N.W. at 79.

For the reasons announced in *Nieuwenhuis*, and reiterated in *In Re Lansing's Estate*, 51 S.D. 615, 216 N.W. 353 (1927), *Orr v. Kneip*, 287 N.W.2d 480 (S.D.1979), and *First National Bank of Beresford v. Anderson*, 291 N.W.2d 444 (S.D.1980), the verdict of the jury was advisory only and SDCL 15–6–39(c), insofar as it attempts to give greater effect to jury verdicts in equity actions, is likewise unconstitutional and void. That conclusion is not changed by the parties' consent to such greater effect because in *Nieuwenhuis*, *Central Loan & Investment Co. v. Loiseau*, 59 S.D. 255, 239 N.W. 487 (1931), *South Dakota Wheat Growers' Assn. v. Sieler*, 57 S.D. 101, 230 N.W. 805 (1930), and *Orr v. Kneip, supra*, we have consistently recognized the jurisdictional nature of this equity principle. Jurisdiction over subject matter, as distinguished from jurisdiction over the person, cannot be conferred by consent, submission, or failure to object where it does not otherwise exist. *Van Diepen v. Van Diepen*, 73 S.D. 366, 43 N.W.2d 499 (1950); *O'Neal v. Diamond A Cattle Co.*, 63 S.D. 481, 260 N.W. 836 (1935); *Fergen v. Lonie*, 51 S.D. 315, 213 N.W. 720 (1927). And, since a jury verdict on equitable issues is advisory only, the claimed errors of giving or refusing instructions are irrelevant. Because it is the duty and responsibility of the trial court to find the facts and enter conclusions in equitable actions, we are bound to review as if there were no jury. *First Nat'l Bank of Beresford v. Anderson, supra; Orr v. Kneip, supra; Lounsberry v. Kelly*, 32 S.D. 160, 142 N.W. 180 (1913); *First National Bank of Rapid City v. McCarthy*, 18 S.D. 218, 100 N.W. 14 (1904).

SDCL 15–6–2 states: "There shall be one form of action to be known as a 'civil action.' The distinction between actions at law and suits in equity, and the forms of all such actions and suits, are abolished in this state." That statute is not a contemporary legal innovation. It has been codified in essentially its present form since territorial days, 1887 Compiled Laws § 4830; 1887 Civil §§ 33 & 34; 1903 R.C. § 36; 1919 R.C. § 2260; 1939 SDC & 1960 Supp. SDC § 33.0101, and has consistently been interpreted to require one form of action while preserving the inherent substantive principles which underlie and differentiate equity and law. This includes the principle that in a suit in equity a jury's findings are advisory only. *Heiser v. Rodway*, 247 N.W.2d 65 (S.D.1976); *Holzworth v. Roth*, 78 S.D. 287, 101 N.W.2d 393 (1960); *Parsons v. City of Sioux Falls*, 65 S.D. 145, 272 N.W. 288 (1937); *First National Bank of Miles City, Mt. v. Erling Bros.*, 61 S.D. 364, 249 N.W. 681 (1933); *Byrne v. McKeachie*, 29 S.D. 476, 137 N.W. 343 (1912). (See annotations in above codes for reference to earlier cases.)

In *In Re Okeson's Estate*, 52 S.D. 387, 217 N.W. 676 (1928), this court again faced an appeal of an equitable action where the trial court had entered its judgment based on a general jury verdict and special interrogatories, unsupported by findings and conclusions. The *Okeson's* court acknowledged that the trial court's failure to enter findings was not urged as error on appeal. Likewise neither party in this case raised that issue on appeal. Nevertheless this court is required, on its own motion if necessary, to determine jurisdictional questions. *In Re Mackrill's Add'n*, 85 S.D. 196, 179 N.W.2d 268 (1970); *Sioux City Boat Club v. Mulhall*, 79 S.D. 668, 117 N.W.2d 92 (1962); *Tri-State Milling Co. v. Bd. of Co. Comm. for Pennington Co.*, 75 S.D. 466, 68 N.W.2d 104 (1955). The jurisdictional question in this case is whether the trial court was empowered to enter a judgment on a verdict in an equity action. The answer is no.

Findings and conclusions in equity actions are statutorily mandated. SDCL 15–6–52(a) provides, in part: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall unless waived as provided by § 15–6–52(b) find the facts specially and state separately its conclusions of law thereon[.]" SDCL 15–6–52(b) states: "Findings of fact and conclusions of law are waived by failing to appear at the trial, by consent in writing filed with the clerk, by oral consent in open court, or by entering into a stipulation of facts for consideration by the court."

The SDCL 15–6–52(a) requirement that waiver of findings and conclusions is accomplished only by compliance with SDCL 15–6–52(b) is fully supported by case law. In *Central Loan & Investment Co., supra* 239 N.W. at 495, we said: "A jury verdict, the legal effect of which is advisory only, will not support a judgment . . . . [I]f the determination of the jury is advisory only (*State v. Nieuwenhuis* and accompanying cases cited supra) . . . the judgment must be supported by findings of fact and conclusions of law duly made and entered by the court . . . unless findings are waived in the manner provided by section 2527, R.C. 1919 [presently codified in SDCL 15–6–52(b)]." To the same effect is *Bunnell v. Kindt*, 83 S.D. 377, 159 N.W.2d 923 (1968), *Nelson v. Nelson*, 82 S.D. 404, 147 N.W.2d 1 (1966), and *Chandler v. Kennedy*, 8 S.D. 56, 65 N.W. 439 (1895). The record here is devoid of any waiver of findings of fact and conclusions of law.

The majority decision clearly erodes equity jurisdiction as it is firmly imbedded in our constitution and settled case law. As above noted, *Nieuwenhuis* was based squarely on the Michigan case of *Brown v. Kalamazoo Circuit Judge.* The Supreme Court of Michigan in *Wolf v. Walch*, 385 Mich. 253, 188 N.W.2d 544 (1971), eloquently reaffirmed the principles stated in *Brown* and the importance of safeguarding the integrity of equity jurisdiction in state courts.

The original edition of Pomeroy's 'Treatise on Equity Jurisprudence' was published in 1881. The author at that time warned the profession forcefully that

what then was termed the 'Reformed Procedure' (recognized loosely today as the 'union of law and equity,' the 'blended procedure,' or the 'procedural merger') would unless controlled result inevitably in the gradual suppression and final disappearance of equitable principles and doctrines and the supplanting thereof 'by the more inflexible and arbitrary rules of the law; until in time equity would practically cease to be a distinctive part of the national jurisprudence.'

\* \* \* \* \* \*

'(1) *Most important, the distinctions between law and equity must continue to be recognized for the purpose of preserving constitutional rights to trial by jury in legal matters and trial by court in equity matters. Brown v. Kalamazoo Circuit Judge, 1889*, 75 Mich. 274, 42 N.W. 827. (emphasis added.)

'(2) The substantive elements of the cause of action—that is, the facts which must be proved to establish a claim or defense—and the kind of remedy the court can give must still be determined by reference to the substantive law of the actions in law and equity *as they previously existed.*' (emphasis in original.)

\* \* \* \* \* \*

So long as the *Brown Case* stands as it does—and should—on our books, the right and duty of the trial court to hear and determine this equity case to decretal judgment, with or without an advisory jury, is constitutionally sound law in our State. In Michigan, *unlike the Federal practice with its involvement of specific acts of Congress and the Seventh Amendment*, we determine properly under our Constitution the extent of equity's jurisdiction, duties and powers. (emphasis added.)

*Id.* 188 N.W.2d at 547, 548, 550 (footnotes omitted).

Our State Constitution provides: "The right of trial by jury shall remain inviolate *and shall extend to all cases at law ...."* S.D.Const. art. VI, § 6 (emphasis added). That provision differs markedly from the jury trial provision in the Federal Constitution.[1] As is made plain in *Wolf*, the interpretation federal courts give to Rule 39(c) is not binding on states with different constitutional provisions and case law based thereon, and which are not controlled by acts of Congress.

Accordingly, this case should be remanded with directions for the trial court to enter findings of fact and conclusions of law and judgment.

---

1. U.S.Const. amend. VII reads: In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.